IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs September 13, 2022

## RHYNUIA[1] L. BARNES v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Davidson County**
**No. 97-D-2542      Steve R. Dozier, Judge**

_____

### No. M2022-00367-CCA-R3-PC

_____

The petitioner, Rhynuia L. Barnes, who was convicted of first degree premediated murder, appeals the summary dismissal of his petition for post-conviction fingerprint analysis. The petitioner argues that fingerprint analysis of his deceased father's palm print would prove his innocence if his father's print were a match to the unidentified palm print discovered on the murder weapon. After review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

KYLE A. HIXSON, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT L. HOLLOWAY, JR., JJ., joined.

Rhynuia L. Barnes, Pikeville, Tennessee, Pro Se.

Herbert H. Slatery III, Attorney General and Reporter; Benjamin A. Ball, Senior Assistant Attorney General; Glenn R. Funk, District Attorney General; and J. Wesley King, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### I.      FACTUAL AND PROCEDURAL HISTORY

The petitioner was indicted in 1997 for the first degree premeditated murder of Da'Shon Martin ("Mr. Martin"). *State v. Rhynuia Lamont Barnes*, No. M2001-00631-CCA-R3-CD, 2002 WL 1358717, at *1 (Tenn. Crim. App. June 24, 2002), *perm. app. denied* (Tenn. Dec. 2, 2002). Following a jury trial in 1999, he was convicted as charged and sentenced to life in prison. *See id.* This court affirmed the petitioner's conviction on

---

[1] Past opinions from this court spell the petitioner's first name both as Rhynuia and Rhynuia. However, all documents contained in the appellate record in this case, including the petitioner's own briefs, refer to the petitioner as Rhynuia. Accordingly, we will utilize Rhynuia in this opinion.

direct appeal, and the Tennessee Supreme Court denied his request for discretionary review. *See id.*

The pertinent facts from the underlying trial, as summarized by this court on direct appeal, are as follows:

Joyce Martin testified she lived with her two sons, 24 year-old Da'Shon Martin, the victim, and 19 year-old Carlton Martin. She stated that on September 2, 1997, at approximately 2:00 p.m., Tom Morrell, a neighbor, came to her door and asked if the victim were home. Martin responded the victim was sleeping in his room, and Morrell walked toward his room and told the victim someone wanted to see him. Morrell then walked out of the residence and returned to his home. Martin stated she looked outside her house and saw the [petitioner], whom she had never met, standing at her gate. The victim exited the residence, stood on the porch, and inquired what the [petitioner] wanted. Martin said she next saw the [petitioner] brandish a pistol, at which time the victim ran back inside the house. The [petitioner] then said, "Your son stole my jewelry, and I'm going to kill him;" the victim ran to the back of the house; and the [petitioner] ran to [Martin's] backyard with his gun in his hand. Martin explained her back door was secured by a deadbolt key lock which required a key to open.

Martin further testified she phoned 911 while the victim was hiding in the back of the residence, and the [petitioner] was in the backyard. The [petitioner] then ran back inside [Martin's] front door holding his gun. The [petitioner] then said twice that he would shoot [Martin] if the victim did not come out of hiding. At that point, the [petitioner] ran toward the bathroom at the rear of the house, and another man, later identified as James Barnes, the [petitioner's] father, entered the residence and inquired about his son. Martin told James Barnes the [petitioner] went to the rear of the house. Martin testified she then heard one shot and fled from the residence to a neighbor's home. Martin identified the murder weapon as the gun she saw in the [petitioner's] hand.

Tommy Morrell, a neighbor, testified that on September 2nd, the [petitioner] arrived at approximately 3:00 p.m. riding in the front seat of a vehicle driven by an older man. Morrell testified the [petitioner] requested he get the victim. Morrell further stated he went inside the victim's house and told the victim "two guys" wanted to see him, and Morrell exited the house. When Morrell reached the front gate, he saw the victim step onto the

porch. Morrell later saw the [petitioner] go inside the gate. Morrell further stated the older man was seated in the car.

Morrell explained he knew "something [was] going down," so he went back to his house and instructed his mother to stay inside. Morrell stated the older man exited the car; the [petitioner] first ran in the house but then exited the house telling the older man that "[the victim] might have gone out the backdoor;" the [petitioner] ran around one side of the house, while the older man ran around the other; the [petitioner] ran back around to the front of the house and entered it brandishing a gun; the older man entered the house; and [Morrell] heard a gunshot. Morrell stated he never saw the older man with a gun. On cross-examination, Morrell denied receiving drugs as compensation for summoning the victim outdoors.

. . . .

Metro Police Officer Marshall James Brown testified he and his partner, Officer Chris Locke, arrived at the scene . . . . Officer Brown stated that while he and Officer Locke were walking toward the residence, the [petitioner] ran from across the street and dove head first into the backseat of a parked car. He additionally stated James Barnes walked toward the vehicle's driver's side. He and Locke then detained them, and Joyce Martin identified them as the persons in her home. On cross-examination, Officer Brown stated James Barnes was bleeding from a cut on his hand.

Officer Chris Locke corroborated Officer Brown's testimony. He further testified the [petitioner] made remarks after being arrested; he activated his pocket audio recorder to record the [petitioner]; and he made notes during the [petitioner's] outbursts. He testified the [petitioner], while being handcuffed, stated that the victim should not break in his house and steal his jewelry. At that point, Officer Locke placed the [petitioner] in the rear seat of the cruiser, activated his pocket audio recorder, and sat in the driver's seat for approximately one hour and fifteen minutes. Officer Locke also wrote down the [petitioner's] statements verbatim. Officer Locke testified from his written notes, which indicated the [petitioner] said:

> I went in the house with him; I didn't shoot him; I threw my dope in the alley; that's why I ran. I ain't did nothing. I ain't got no gun; what [are] you detaining me for . . . . He needed to quit lying on me. He finded . . . no gun on me. Why am I being detained? I ran and dumped my dope and came back . . . . No

gun, no motive. I ain't got no lie to tell. I dumped my dope. He stole my jewelry.

At that point, other officers found a gun in the [petitioner's] line of sight, and the [petitioner] said, "Man, ain't found no gun on me. Man, how do you know it was me; that could have been anybody's. Whose gun? I know my lawyer will get me off. I got money; I got big money. Take me down so I can make bond." The [petitioner] also stated, "Man, he steals $4,000 worth of jewelry and I'm supposed to let it ride. F* *k that s* *t, man."

Metro Police Investigator David Elmore testified he searched the area and found a gun hidden inside a plastic bag of clothing in a pile of garbage across the street from the victim's residence.

Metro Police Officer Charles Ray "Friday" Blackwood testified he searched the victim's residence and was unable to find a weapon; he recovered three live .38 shells from James Barnes' pocket; and the .38 revolver found in the garbage had five spent casings in its chambers.

Medical Examiner Dr. Bruce Levy testified the victim died as a result of three gunshot wounds fired from a distance of "greater than 18 to 24 inches" from the victim's body. Although Dr. Levy stated the victim had small abrasions on his chin, arm, back, and abdomen, he opined they were not the result of a struggle.

Danny Morris, a specialist in latent fingerprint analysis with the Metro Police Identification Division, testified a palm print was recovered from the weapon that did not match the [petitioner's] print. Morris explained, however, this evidence did not definitively establish that the [petitioner] never handled the gun since there are numerous reasons why one could touch a surface and not leave a latent print.

Metro Police Detective Kent McAlister testified he searched the crime scene and was unable to find a gun or spent shell casings. Det. McAlister stated although the [petitioner] and James Barnes were initially both suspects, the charges against James Barnes were dropped at his preliminary hearing. He explained James Barnes was not initially fingerprinted because his hand was bandaged, and after the charges were dropped, it became impossible to obtain his prints.

Metro Police Detective Jeff West testified he assisted in interviewing the [petitioner] at the police station. He testified that although he could not recall if the [petitioner] and James Barnes were seated together while awaiting questioning, it was unlikely because standard procedure dictates they be separated. Det. West testified the [petitioner] confessed to the crime and told him to release James Barnes because he had "nothing to do with it" and had tried to stop him from going into the Martin residence with his gun.

TBI firearms expert Steve Scott testified the shell casings and bullet fragments submitted for analysis were fired from the .38 revolver. Scott conceded the gun was not tested for the presence of blood or tissue, and it was possible for a person's hand to become injured if caught between the weapon's hammer and firing pin.

The [petitioner] testified when he got in the car with his father, James Barnes, on September 2nd, he did so with the intention of receiving a ride to visit his son. The [petitioner] stated his father requested the [petitioner] direct him to the [petitioner's] drug supplier, a person by the name of "Ricko," which the [petitioner] did. After their arrival, James Barnes asked Ricko the location of his stolen jewelry, and they drove to the victim's residence to replevy the jewelry. The [petitioner] stated his father parked his vehicle on the street near the victim's residence, handed the [petitioner] the revolver, and told the [petitioner] to place it in his pocket. The [petitioner] testified the gun remained in his shorts until he handed it back to James Barnes. He stated that, under the instruction of James Barnes, he gave Tommy Morrell drugs to summon the victim outside.

The [petitioner] further testified he and James Barnes walked toward the residence, and the victim exited onto the porch. When the [petitioner] inquired, "where [is] the jewelry," the victim ran back inside the home. The [petitioner] stated he then stepped in the front room of the house, and the victim's mother told him to "get out;" he exited and ran around the side of the house, attempting entry through the back door; and since the door was locked, he returned to the front of the house where he handed James Barnes the gun. The [petitioner] said he "[g]ave [James Barnes] the gun back [and] started out [of] the yard . . . thinking he's coming behind me . . . thinking it's over."

The [petitioner] further stated once he arrived at the car, he realized his father had not followed him, so he reentered the residence, went to the rear of the home, and saw the victim run to the bathroom. He then attempted to open the bathroom door, which was either locked or being held, and as he

started to leave the home again, James Barnes fired a shot through the bathroom door. After the shot was fired, the victim exited the bathroom and struggled for the gun with James Barnes. The [petitioner] stated that after a brief struggle, James Barnes fired shots, handed the [petitioner] the gun, and they exited the home. The [petitioner] stated he then ran across the street and discarded his "eighty-ball" of "dope" and the gun. He stated that he ran back to the car because he thought he left his beeper in the car and then dove into the car.

The [petitioner] stated he had no intention of killing the victim, and after he was arrested, he made admissions to Officer Locke because

> in [his] neighborhood, it's like, you try to make the polices as mad as you can by being as smooth as you can with them. You just smart off to them, just try to smart off to them, make them mad cause like—that' all I was doing was really just mouthing off.

The [petitioner] further testified he was seated next to his father at police headquarters, and his father intimidated him, so he confessed to the crime. The [petitioner] explained he was fearful of his father, and his father had always said "the worst thing you can be is a snitch."

The [petitioner] further testified he "probably" threatened to shoot the victim's mother, but did so to try to scare her out of the house so "no more innocent bystanders [would get] hurt;" he got blood on his shorts while attempting to protect the victim by trying to separate James Barnes from him; and James Barnes wiped the gun clean prior to giving it to him. The [petitioner] further admitted he had contact with James Barnes while awaiting trial on bond, and he conceded he said he was on bond because of the person he killed, but explained it was just "everyday neighborhood talk."

*Barnes*, 2002 WL 1358717, at *1-4.

Following the completion of his direct appeal, the petitioner, in 2003, filed a petition for post-conviction relief arguing ineffective assistance of counsel, including an allegation therein relating to trial counsel's failure to obtain "major case prints" for Mr. Barnes, and a violation of the petitioner's rights under the Confrontation Clause. *Rhynuia L. Barnes v. State*, No. M2004-01557-CCA-R3-PC, 2005 WL 2139408, at *1, *7-8 (Tenn. Crim. App. Sept. 2, 2005), *perm. app. denied* (Tenn. Feb. 6, 2006). This court affirmed the trial court's denial of relief. *Id.* at *1.

In 2009, the petitioner filed his first petition for writ of error coram nobis alleging that a letter, written by his late father confessing to the murder, was newly discovered evidence. This court affirmed the coram nobis court's summary dismissal of the petition as time-barred. *Rhynuia L. Barnes v. State*, No. M2010-01554-CCA-R3-CO, 2011 WL 6322500, at *1 (Tenn. Crim. App. Oct. 27, 2011), *perm. app. denied* (Tenn. Mar. 7, 2012). In 2015, the petitioner filed a second petition for writ of error coram nobis, alleging newly discovered evidence in the form of a report from the Bureau of Alcohol, Tobacco, Firearms, and Explosives that exonerated him, as well as some emails between his attorney and the prosecutor that indicated his innocence. Again, this court affirmed the coram nobis court's summary dismissal of the petition as time-barred. *Rhyunia Lamont Barnes v. State*, No. M2015-01061-CCA-R3-ECN, 2016 WL 537127, at *1 (Tenn. Crim. App. Feb. 10, 2016). In 2017, the petitioner filed his third petition for writ of error coram nobis, alleging newly discovered evidence in the form of an affidavit of his ex-girlfriend, Rebecca C. Castor, which he claimed proved his actual innocence. Once again, this court affirmed the coram nobis court's summary dismissal of the petition as time-barred. *Rhyunia Lamont Barnes v. State*, No. M2017-02033-CCA-R3-ECN, 2018 WL 3154346 (Tenn. Crim. App. June 26, 2018), *perm. app. denied* (Tenn. Oct. 10, 2018).

According to the petitioner, Mr. Barnes died in October 2002. *Barnes*, 2005 WL 2139408, at *4. On December 13, 2021, the petitioner filed a pro se "Motion to Exhumation [sic] of Body of Movant Father James C. Barnes for Purpose of D.N.A." Through the motion and attachment, the petitioner indicated that there was a palm print found on the murder weapon, that the petitioner's print was not a match, and that a "good palm print" was not obtained from Mr. Barnes while Mr. Barnes was in police custody. Submitting that he was innocent, the petitioner requested that Mr. Barnes's body be exhumed to obtain an adequate palm print for comparison purposes.

By order dated February 16, 2022, the post-conviction court dismissed the petitioner's request for exhumation, concluding that the petitioner had not established any basis that exhumation of Mr. Barnes was absolutely necessary to the administration of justice. The post-conviction court observed that overwhelming proof was presented at trial evidencing the petitioner's guilt. The post-conviction court further noted that the petitioner "appear[ed] to be angling for another error coram nobis petition in which he . . . continue[d] to blame the homicide on his father" and that the petitioner had filed three prior unsuccessful coram nobis petitions. The post-conviction court concluded that there was no reasonable basis to exhume Mr. Barnes's body nor any expectation that the undertaking would yield usable prints 20 years after his death.

Also, on February 16, 2022, the petitioner filed a pro se petition for fingerprint testing of his deceased father pursuant to the Post-Conviction Fingerprint Analysis Act of 2021 ("Fingerprint Act"). *See* Tenn. Code Ann. §§ 40-30-401 to -413. He again sought "testing of his father's palm prints against the unknown palm prints on the murder

weapon[,]" a weapon that he stated belonged to Mr. Barnes's girlfriend. The petitioner submitted that the case against him "was built entirely on circumstantial evidence" and argued that there was a reasonable probability he would not have been convicted if the palm print had been identified as belonging to Mr. Barnes. The petitioner then asserted that the TBI had Mr. Barnes's fingerprints in its possession and that those prints had not "been entered into state or federal databases since [those] systems [had] undergone critical updates." The petitioner concluded that all necessary evidence was available to conduct the requested fingerprint analysis. The petitioner further requested that should Mr. Barnes's fingerprints not be found, Mr. Barnes's body be exhumed in order to obtain them.

The post-conviction court summarily dismissed the petition in an order filed on February 28, 2022. The post-conviction court found that the petitioner had not established any of the required factors of Tennessee Code Annotated section 40-30-404 and that he would likewise be unable to do so at a subsequent hearing. This timely appeal followed.

## II.    ANALYSIS

On appeal, the petitioner contends that the post-conviction court erred when it summarily dismissed his petition because fingerprint testing would exonerate him of the charged offenses. The petitioner suggests that analysis of Mr. Barnes's palm print would link Mr. Barnes to the murder weapon and prove the petitioner's innocence. The State responds that the post-conviction court properly dismissed the petition, correctly determining that the petitioner did not satisfy the requirements of the Fingerprint Act. We agree with the State.

The Fingerprint Act provides that a petitioner convicted of specific offenses, including first degree murder, "may, at any time, file a petition requesting the performance of fingerprint analysis of any evidence that is in the possession or control of the prosecution, law enforcement, laboratory, or court, and that is related to the investigation or prosecution that resulted in a judgment of conviction and that may contain fingerprint evidence." Tenn. Code Ann. § 40-30-403. Tennessee Code Annotated section 40-30-404 requires that once the State has been provided notice and an opportunity to respond, the court shall order fingerprint analysis if it finds that:

> (1) A reasonable probability exists that the petitioner would not have been prosecuted or convicted if exculpatory results had been obtained through fingerprint analysis;
> (2) The evidence is still in existence and in such a condition that fingerprint analysis may be conducted;
> (3) The evidence was not previously subjected to fingerprint analysis, was not subjected to the analysis that is now requested which could resolve an issue not resolved by previous analysis, or was previously subjected to

- 8 -

analysis and the person making the motion under this part requests analysis that uses a new method or technology that is substantially more probative than the prior analysis; and

(4) The application for analysis is made for the purpose of demonstrating innocence and not to unreasonably delay the execution of sentence or administration of justice.

The Fingerprint Act also has a discretionary provision, which states that the court may order fingerprint analysis if it finds certain elements are shown. *See id.* § 40-30-405. In the case under submission, the petitioner cited to the mandatory provision of section 404 in his petition, and the post-conviction court limited its analysis to the terms of that section. We will do the same.

Because the language of the Fingerprint Act mirrors, for the most part, the wording of the Post-Conviction DNA Analysis Act of 2001 ("DNA Act"), this court has sanctioned looking to case law discussing the DNA Act for guidance, noting that the appellate courts of this State have had ample opportunity over the last twenty years or so to interpret the meaning of the DNA Act. *See Oscar Smith v. State*, No. M2021-01339-CCA-R3-PD, 2022 WL 854438, at *13 (Tenn. Crim. App. Mar. 23, 2022), *perm. app. denied* (Apr. 6, 2022). With these tenets in mind, we observe that under both the mandatory and discretionary provisions, the petitioner must satisfy all four requirements before fingerprint analysis will be ordered by the court. *Id.* (citing *Powers v. State*, 343 S.W.3d 36, 48 (Tenn. 2011)). In addition, a trial court is not required to hold a hearing to determine whether a petition for fingerprint analysis should be granted or denied. *Id.* (citing *Charles Elsea v. State*, No. E2017-01676-CCA-R3-PC, 2018 WL 2363589 at *3 (Tenn. Crim. App. May 24, 2018)). The post-conviction court's determination of whether to grant a petition for post-conviction fingerprint analysis is reviewed for abuse of discretion. *See Elsea*, 2018 WL 2363589, at *3.

The first requirement of section 404 is that "[a] reasonable probability exists that the petitioner would not have been prosecuted or convicted if exculpatory results had been obtained through fingerprint analysis." Tenn. Code Ann. § 40-30-404(1). "The definition of 'reasonable probability' has been well-established in other contexts, and is traditionally articulated as a probability sufficient to undermine confidence in the outcome" of the prosecution. *Smith*, 2022 WL 854438, at *13 (quoting *Powers*, 343 S.W.3d at 54) (internal quotations omitted)). Applying our supreme court's DNA analysis dictates from *Powers* to the instant case, we begin with the proposition that the fingerprint analysis will prove to be favorable to the petitioner. *See* 343 S.W.3d at 55, n.28. "While courts must also consider the evidence that was presented against petitioner at trial, the evidence must be viewed in light of the effect that favorable [fingerprint] evidence would have had on the fact-finder or the State." *Id.* at 55. "[T]he analysis must focus on the strength of the [fingerprint] evidence as compared to the evidence presented at trial—that is, the way in

- 9 -

which the particular evidence of innocence interacts with the evidence of guilt." *Id.* (quotation omitted). However, there is no presumption of innocence afforded a petitioner who requests fingerprint analysis pursuant to the Fingerprint Act. *See Elsea*, 2018 WL 2363589, at *4 (citation omitted).

The petitioner has failed to show a reasonable probability that he would not have been prosecuted or convicted had fingerprint analysis demonstrated that the palm print on the gun belonged to his father. The petitioner testified at trial that his father handled the gun both before and after the shooting of Mr. Martin. *Barnes*, 2002 WL 1358717, at *3-4. The presence of his father's palm print on the weapon, therefore, would not have been inconsistent with the petitioner's defense theory. As the post-conviction court observed, the exculpatory aspect of the fingerprint evidence—*i.e.*, that a palm print was on the weapon that did not belong to the petitioner—"[was] originally obtained through analysis and considered at trial." Even if the exculpatory effect of this evidence was bolstered by a definitive forensic link between the palm print and the elder Mr. Barnes, there is no reasonable probability that this connection would have altered the prosecutor's charging decision or the jury's ultimate conclusion, given the other incriminating evidence in the record. This evidence at trial included two eyewitnesses who saw the petitioner brandish the weapon, the petitioner's verbal threat to kill Mr. Martin, and the petitioner's later confession to committing the crime. Moreover, the latent fingerprint specialist explained that the absence of a palm print on the pistol did not mean that the petitioner never touched it, opining that there were numerous reasons why a person could touch a surface and not leave a latent print.

The second requirement of section 404 is that "[t]he evidence is still in existence and in such a condition that fingerprint analysis may be conducted." Tenn. Code Ann. § 40-30-404(2). On appeal, the petitioner asserts that Mr. Barnes's fingerprints were "on file" with the TBI, and thus, all necessary evidence is available to conduct the requested analysis. However, the correspondence the petitioner attached to his various pleadings indicates that "rolled exemplars" of Mr. Barnes's fingerprints were obtained but that major case prints, which would include a palm print, were not. In addition, a detective at trial testified that it became "impossible" to obtain Mr. Barnes's prints after the charges against him were dropped.

The post-conviction court noted that it had recently refused to exhume Mr. Barnes's remains and emphasized that even if the weapon were still in existence, Mr. Barnes's prints were not obtainable from 20-year-old remains. The post-conviction court also indicated that there was no legal basis to obtain major case prints from Mr. Barnes while he was alive. In the petitioner's post-conviction appeal, this court held that trial counsel's failure to obtain Mr. Barnes's major case prints did not constitute deficient performance, reasoning that the petitioner had failed to prove that Mr. Barnes's prints could have been obtained through legal avenues or surreptitiously. *See Barnes*, 2005 WL 2139408, at *8.

Ultimately, the post-conviction court in this case concluded that conditions did not exist "for accurate conduction of such tests." We agree that there is no proof that Mr. Barnes's palm print is currently in any testable condition.

The third requirement of section 404 is that "[t]he evidence was not previously subjected to fingerprint analysis, was not subjected to the analysis that is now requested which could resolve an issue not resolved by previous analysis, or was previously subjected to analysis and the person making the motion under this part requests analysis that uses a new method or technology that is substantially more probative than the prior analysis." Tenn. Code Ann. § 40-30-404(3). The post-conviction court observed that the weapon was previously subjected to fingerprint analysis and that the petitioner had not offered any new methods or technologies that were substantially more probative than prior analysis. The post-conviction court further noted that though the petitioner "claimed federal and state database upgrades [were] sufficient grounds, . . . database upgrades [were] not inclusive of new testing methods or technologies." We agree that the mere possibility that Mr. Barnes's palm print might have been subsequently uploaded into these databases does not equate with "a new method or technology" as contemplated by the statute. Nor did the petitioner offer proof that any methodology currently exists to obtain a palm print from a deceased's 20-year-old remains.

The fourth requirement of section 404 is that "[t]he application for analysis is made for the purpose of demonstrating innocence and not to unreasonably delay the execution of sentence or administration of justice." Tenn. Code Ann. § 40-30-404(4). The post-conviction court found that additional fingerprint analysis would not demonstrate the petitioner's innocence because of the overwhelming evidence that led to his conviction, despite the absence of the petitioner's prints on the murder weapon. Again, even if the palm print matched Mr. Barnes's print, it would not demonstrate the petitioner's innocence.

We conclude that the post-conviction court did not abuse its discretion by summarily dismissing the petition because the petitioner had failed to satisfy all four elements of section 404. The petitioner is not entitled to relief.

## III.    CONCLUSION

Upon consideration of the foregoing, the judgment of the post-conviction court summarily dismissing the petition for fingerprint analysis is affirmed.

_____
KYLE A. HIXSON, JUDGE